T. A. LOVING COMPANY, PLAINTIFF v. JAMES F. LATHAM, BILL
PRICE, M. GLENN PICKARD AND HUGH CUMMINGS III, INDI-
VIDUALLY AND TRADING AS HOLLY HILL REALTY, A PARTNERSHIP,
AND THE WESTERN CORPORATION, ORIGINAL DEFENDANTS, AND
AETNA CASUALTY AND SURETY COMPANY, ADDITIONAL DE-
FENDANT

No. 7315SC740

(Filed 9 January 1974)

1. **Contracts § 16— conditions precedent — insufficiency of evidence**

In a general contractor's action to recover the balance allegedly
due for construction of a shopping center wherein the evidence showed
that the original construction contract contained no guaranteed maxi-
mum construction price, that plaintiff executed a new contract with
defendants containing a maximum cost figure in order for defendants
to obtain a construction loan, and that defendants signed and delivered
to plaintiff a letter in which defendants acknowledged that the maxi-
mum cost provision in the reexecuted contract was not binding upon
plaintiff and agreed to hold plaintiff harmless if the final cost ex-
ceeded that amount, defendants' evidence was insufficient to require
submission to the jury of an issue as to whether the letter signed by
defendants was to become effective only upon conditions that plaintiff
establish and maintain a cost control system which would enable
plaintiff to have knowledge of the cost factors during all stages of
construction and that plaintiff keep defendants currently informed of
all cost data during all stages of construction, the evidence at most
indicating no more than an understanding that plaintiff would main-
tain an accurate cost system and would keep defendants currently in-
formed as the work progressed.

2. **Contracts § 4— reexecuted contract and letter — consideration for
agreement in letter**

Where a letter was executed and delivered by defendants simul-
taneously with a reexecuted construction contract as a part of a single
transaction and the letter and reexecuted contract together constituted
a single agreement, plaintiff's execution of the reexecuted contract
supplied ample consideration to defendants to make the obligations
they assumed in the letter contractually binding upon them.

3. **Evidence § 32— parol evidence rule — letter intended as part of agree-
ment**

The parol evidence rule did not render inadmissible a letter exe-
cuted and delivered simultaneously with a reexecuted construction con-
tract where it is clear the parties intended the letter to be an essential
and integral part of their contract, notwithstanding the reexecuted
contract was on a printed form containing an express merger clause.

4. **Contracts § 6— reexecuted contract to obtain loan — agreement that
cost figure was not binding — failure to inform lender and surety —
public policy**

Where the original contract for construction of a shopping center
contained no guaranteed maximum construction price, and the general

Loving Co. v. Latham

contractor executed a new contract with the owners containing a maximum cost figure in order for the owners to obtain a construction loan, written agreement by the owners that the maximum cost provision in the reexecuted contract was not binding upon the contractor and that they would hold the contractor harmless if the final cost exceeded that amount was not void as against public policy by reason of the contractor's failure to disclose the existence of the agreement to the lender and to the surety on the contractor's performance bond.

APPEAL by original defendants from *Bailey, Judge,* 9 April 1973 Session of Superior Court held in ALAMANCE County.

This is a civil action in which plaintiff, a general contractor, seeks to recover $1,582,276.28 with interest from 25 September 1970, which plaintiff alleged was the balance owed to it by the original defendants by contract under which plaintiff constructed a large shopping center known as Holly Hill Mall on real property of defendants at Burlington, N. C. The individual original defendants and partnership will hereinafter be referred to simply as the defendants and the additional defendant will be referred to as Aetna. Defendants filed answer which contained a number of affirmative defenses constituting pleas in bar. A separate hearing was had on the Fourth and Fifth Defenses set out in the defendants' answer, and the present appeal is from judgments in favor of plaintiff on those defenses. The facts pertinent to the questions presented by this appeal are summarized as follows:

On 16 May 1968 plaintiff and defendants entered into a written contract for construction of the shopping center, under which plaintiff was to be paid its costs of construction plus a fixed fee of $350,000.00. This contract did not contain any guaranteed maximum construction price. On 16 May 1968 plaintiff and defendants also entered into another contract, collateral to the construction contract, which recites that defendants had obtained a commitment from Wachovia Bank and Trust Company (Wachovia) for a loan of $6,500,000.00 to finance construction of the center, that defendants anticipated such loan would be sufficient to cover the full costs of construction but that plaintiff and defendants were aware that the cost of the project might exceed that amount, and provides that in that event plaintiff would furnish to defendants funds or credit in the form of secondary financing in an amount not to exceed $250,000.00. Copies of these two contracts were delivered to Wachovia by defendants, who shortly thereafter advised plaintiff that Wachovia insisted upon a guaranteed maximum

contruction price. At that time the plans for the shopping center were not yet complete and plaintiff was not willing to give a guaranteed maximum price. However, at request of the defendants, the plaintiff did agree to write a letter to defendants guaranteeing that the construction cost would not exceed $5,500,000.00 (it being understood that $1,000,000.00 of the $6,500,000.00 Wachovia loan was needed for matters other than the construction costs), provided defendants on their part would agree in writing to hold plaintiff harmless if the final cost exceeded $5,500,000.00. In furtherance of this understanding, and on 26 June 1968, plaintiff did write such a letter to defendants, addressing the letter to defendant Latham who was acting in this matter for all of the original defendants, and forwarding this letter to defendants with a second letter, also dated 26 June 1968 and addressed to defendant Latham, containing the following:

> "Enclosed is a copy of the letter confirming our telephone conversation of June 25, 1968 regarding the guaranteed maximum price required by Wachovia Bank and Trust Company.

> "In accordance with our verbal agreement, we shall have a written agreement prepared for your signature which would take precedent over the mentioned letter should our final price exceed the $5,500,000.00 figure. Please be assured, however, that we feel this figure is adequate and that we are very optimistic about bringing the final cost in under the quoted maximum."

In a letter dated 11 July 1968 defendants wrote to plaintiff as follows:

> "In confirmation of our oral understanding with you, we acknowledge and agree (i) that your letter addressed to James F. Latham dated June 26, 1968 (copy of which is attached) was delivered without consideration at our request and solely for our benefit in order that financing of the subject project through Wachovia Bank & Trust Company could be obtained; (ii) that such letter was not intended to constitute, and does not constitute, an amendment to or modification of our contract with you dated May 16, 1968 for construction of the subject project; and (iii) that such letter does not represent a binding commitment by you to us. We also ratify and confirm each and every provision of said construction contract dated May 16,

Loving Co. v. Latham

1968 and acknowledge an obligation to compensate you for construction of the subject project in the amount and manner specified by the terms and provisions of such contract."

Thereafter, defendants received from Wachovia a construction loan commitment letter dated 9 August 1968 by which Wachovia agreed, on certain conditions, to make a loan to defendants in the amount of $6,500,000.00 to finance construction of the shopping center. This commitment limited the disbursements which could be made to plaintiff during course of the construction and expressly provided:

"In any event, the $250,000.00 in addition to the normal 5% retainage will be withheld from disbursement since the general contractor has agreed to provide $250,000.00 in secondary financing if necessary. The contract amount must be shown on the contract and should not exceed $5,500,000.00."

By letter dated 15 August 1968 defendants wrote to plaintiff, enclosing copies of Wachovia's construction loan commitment and of Wachovia's long-term commitment, which were both dated 9 August 1968, pointing out to plaintiff that in order for these commitments to be effective it would be necessary for plaintiff to execute a new contract with defendants containing a maximum cost figure and that plaintiff agree to the other requirements set forth in Wachovia's loan commitment letters. At that time plans for the center were still incomplete.

On 19 August 1968 plaintiff and defendants signed a written contract, which they dated 16 May 1968, for construction by plaintiff of the shopping center at cost plus a fixed fee of $350,000.00. This reexecuted construction contract, unlike the first construction contract, contained a provision, Article 6.2, that "[t]he maximum cost to the owner, including the Cost of the Work and the Contractor's Fee, is guaranteed not to exceed the sum of Five Million Five Hundred Thousand and no/100 dollars ($5,500,000.00)." A copy of this document was attached to plaintiff's complaint as Exhibit A, and this instrument will be hereinafter referred to as the reexecuted construction contract or as Exhibit A. At the same time Exhibit A was signed, a letter addressed to plaintiff and dated 19 August 1968 was

signed and delivered by defendant Latham, acting for the Holly Hill Realty partnership, which letter contains the following:

> "In confirmation of our oral understanding with you, we acknowledge and agree (i) that as of this date our contract with you for construction of Holly Hill Mall dated May 16, 1968, has been re-executed in modified form (ii) that you re-executed and modified said contract without consideration at our request and solely for our benefit in order that financing of the subject project through Wachovia Bank and Trust Company could be obtained; (iii) that as re-executed and modified said contract provides in Article 6 for a maximum construction cost of $5,500,000; (iv) that the provision in the re-executed and modified contract with respect to maximum cost does not represent a binding commitment by you to us; and (v) that we will indemnify and hold you harmless from and against any loss on account of and by reason of said maximum construction cost provision."

This letter was subsequently signed by all of the individual defendants. A copy of this letter as signed by all defendants was attached to the complaint as Exhibit B and this letter will hereinafter be referred to as Exhibit B.

As required by Wachovia's construction loan commitment, plaintiff applied for and obtained from Aetna a dual-obligee performance bond, which was dated 19 August 1968, in which plaintiff is principal, Aetna is surety, and defendants and Wachovia are dual obligees. The amount of this bond was $5,500,000.00 and it was conditioned upon performance by plaintiff of all of its agreements under the construction contract.

Plaintiff completed construction of the shopping center in July 1970 at a cost exceeding the maximum specified in Exhibit A. This action was instituted on 14 January 1971. In its complaint plaintiff alleged that in connection with performance of the contract, Exhibit A as modified by Exhibit B, defendants incurred a total indebtedness to plaintiff in the sum of $7,105,-351.00, that defendants had paid plaintiff $5,500,000.00 and were entitled to certain other credits and adjustments in the sum of $23,074.72, and that there remained an unpaid balance owed to plaintiff in the sum of $1,582,276.28 with interest from 25 September 1970. Defendants' answer set up a number of defenses and counterclaims, the Fourth and Fifth Defenses being in summary as follows:

### Fourth Defense

While admitting that on 19 August 1968 they executed and delivered to plaintiff the letter attached to the complaint as Exhibit B, defendants alleged that Exhibit B was to become effective only upon certain specific conditions, among which were that plaintiff would establish a strict and effective fiscal control system for the project so complete as to enable plaintiff to keep defendants currently informed of all costs data, and that plaintiff would submit each month a detailed statement of such costs and would immediately notify defendant of any indication that $5,500,000.00 would not be sufficient to complete the project in order that defendants could make such design changes or take such other action as might be necessary to keep the construction cost within $5,500,000.00. Defendants alleged that these conditions were conditions precedent, that plaintiff failed to comply with them, and that therefore Exhibit B never became effective and the guaranteed price provision of Exhibit A remained in effect, unmodified.

### Fifth Defense

For their Fifth Defense, defendants alleged (1) that there was no consideration to them for delivery of Exhibit B, and (2) that plaintiff did not disclose Exhibit B to Wachovia or to Aetna, which were thereby misled, and that by reason of such conduct Exhibit B is invalid and void as being in contravention of public policy.

Both plaintiff and defendants regarded the Fourth and Fifth Defenses as pleas in bar and asked that these defenses be tried first. Accordingly, the court ordered a separate trial of the matters raised by these two defenses. The parties filed a final pretrial order in which defendants stipulated that the following were the issues arising upon their Fourth Defense:

"1. Did defendants execute and deliver to the plaintiff Exhibit 'B' on condition that the plaintiff establish and maintain a cost control system that would enable plaintiff to have knowledge of the cost factors during all stages of construction of Holly Hill Shopping Center, and that plaintiff keep defendants currently informed of all cost data during all stages of construction that would affect the cost of construction?

"2. If so, did the plaintiff fail to perform these conditions?"

At the close of evidence offered by defendants, the court allowed plaintiff's motion for a directed verdict in its favor on the Fourth Defense and ordered that the first issue as above set fourth be answered "No."

In the final pretrial order neither party offered an issue of fact as to the Fifth Defense, and subsequently all parties, with concurrence of the court, agreed that all matters arising on the Fifth Defense were for determination by the court. At conclusion of the hearing the court entered an order on the Fifth Defense, making findings of fact, including findings that the letter dated 19 August 1968, Exhibit B of the complaint, had been executed and delivered by defendants simultaneously with the reexecuted construction contract, Exhibit A, "all as one act and as part of a single transaction," that Exhibit B was an integral part of the entire contract and with the reexecuted construction contract constituted a single indivisible agreement, that the simultaneous execution and contemporaneous delivery of the two documents was not intended to defraud and deceive Wachovia or Aetna and in fact did not defraud, deceive or mislead either of them, and that Exhibit B was not invalid and void as being in contravention of public policy. The court concluded and ruled as a matter of law that Exhibit B and the reexecuted construction contract "constitutes a valid contractual agreement between the parties thereto."

From the orders directing verdict in plaintiff's favor on the Fourth Defense and ruling in plaintiff's favor on the Fifth Defense, defendants appealed.

*Poyner, Geraghty, Hartsfield & Townsend by John J. Geraghty and Lacy H. Reaves for plaintiff appellee.*

*Dalton & Long by W. R. Dalton, Jr.; and Latham, Pickard, Cooper & Ennis by T. D. Cooper, Jr., for defendant appellants.*

PARKER, Judge.

### Fourth Defense Appeal

[1] Defendants admit that they signed and delivered to plaintiff their letter dated 19 August 1968, Exhibit B. As their Fourth Defense against enforcement of the obligations expressly assumed in that letter, defendants allege that the letter was executed and delivered by them to become effective only upon certain specified conditions, which they now assert were condi-

tions precedent, that plaintiff failed to comply with these conditions, and that by reason thereof Exhibit B never became effective. The question presented by plaintiff's motion for a directed verdict on the first issue raised by the Fourth Defense is whether the evidence, considered in the light most favorable to defendants, was sufficient to require submission to the jury of an issue as to whether defendants did in fact execute and deliver the letter to become effective only on the conditions specified. We agree with the trial judge's conclusion that the evidence was not sufficient for that purpose.

Certainly nothing in the letter itself, which appears to have been carefully drawn, suggests that the parties understood and intended that it was to be operative only upon conditions. Nor do appellants here contend that any language appears in any of the other numerous documentary exhibits introduced at the trial which supports their position. Rather, they rely upon portions of defendant Latham's testimony concerning telephone conversations which he had with two officers of plaintiff corporation, D. C. Rouse and Banks McNairy. In particular, appellants point to the following portions of defendant Latham's testimony, which relate to telephone conversations which occurred in the latter part of June 1968:

> "I had conversations with Mr. Rouse and Mr. McNairy both concerning what is referred to in the letter [referring to plaintiff's letter to defendants dated 26 June 1968]. Those conversations took place during the preceding approximately week or ten days. As to what discussions we had, Wachovia wanted a guaranteed maximum price, and I so advised the plaintiff of the fact. The plans were not complete. T. A. Loving was not willing to give a guaranteed maximum price on the shopping center where all the plans were not completed. The bank would not disburse without the price. T. A. Loving was willing to give the letter that Mr. Rouse wrote [again referring to plaintiff's letter to defendants of 26 June 1968 regarding the guaranteed maximum price] if in return we were willing to give Loving a letter guaranteeing them that if the price went over the five and half million dollars, we borrowed from Wachovia, that we would reimburse Loving. We were willing to give Loving this letter on condition that Loving do two things; that they have a cost control system on the job that would let them know where the money was going, where it had

gone, what it was being used for, whether there was enough left to finish, and secondly, that they would let us know if anything happened that looked like it would make that cost go over the five and a half million dollars. I was in Winston-Salem on the 25th [of June 1968]. I met with Wachovia and called Mr. Rouse and told him that we had to have the letter and he said, 'All right, we will give you the letter, and you will have to give us a letter to protect us.'

"I said, 'Good, we will give you that letter in return we expect you to protect us.' I said that they would have to keep a tight control on the cost of Holly Hill, the things that had been discussed last month and above all, let us know if the costs get out of line and looks like it is going over. He said he would do that. He said, 'Yes, Jim, we will.'

"As to my having more than one conversation with members of the T. A. Loving Corporation concerning the cost control system and conditions relating to this letter, I had one the following day with Mr. McNairy, the 27th, the following day. I told him about the telephone conversation. We discussed the telephone call, and I told him that D. C. said he was sending the letter and we discussed the same thing then. Mr. McNairy, the Vice President of the corporation, told me the corporation would establish its control."

The foregoing testimony of defendant Latham all relates to conversations which occurred in June 1968. To tie this testimony in with Exhibit B, which defendants admit was executed and delivered on 19 August 1968, defendants point to the following portion of defendant Latham's testimony:

"As to the conversation I had later, I called Goldsboro on August 8th and again on August 15th, when I knew of the Wachovia commitment, those letters dated August 8th (sic). I do not remember which of the two telephone conversations it was, the 8th or the 15th, Mr. Rouse informed me that, 'we will need a new letter to protect us.' I said, 'Certainly, we will be glad to give you another letter, and remember you have to do the same thing, you promised us in the last letter in July.' and he said, 'We will,' and that was it."

Loving Co. v. Latham

Considering the foregoing testimony in the light most favorable to defendants, the evidence falls short of any showing that the parties understood that Exhibit B was signed and delivered by defendants to become effective only upon conditions. At most the testimony indicates no more than an understanding that plaintiff would maintain an accurate cost control system and would keep defendants currently informed as the work progressed. "Where it is doubtful whether words create a promise or an express condition, they are interpreted as creating a promise. . . ." Restatement of Law, Contracts, § 261, quoted in *Construction Co. v. Crain and Denbo, Inc.*, 256 N.C. 110, 123 S.E. 2d 590. This rule of construction applies with particular force in the present case in which appellants attempt to construct a condition precedent not out of the contract documents themselves but from telephone conversations which occurred prior to the time Exhibit B was executed and most of which related to an earlier document which was superseded by Exhibit B.

We also find no merit in appellants' contention that other evidence, which they contend was erroneously excluded by the trial court, would have, either alone or in conjunction with the testimony above referred to, been sufficient to present a jury question on their Fourth Defense. A careful review of the record fails to disclose any excluded evidence which would lend substantial support to defendants' position.

Finally, we note that "the *ante litem motam* practical interpretation of the parties is a safe guide in the interpretation of contracts." *Jones v. Realty Co.*, 226 N.C. 303, 37 S.E. 2d 906. In this connection the record shows that on 27 August 1969, approximately a year after Exhibit B was signed and almost a year and a half before this litigation was commenced, defendant Latham wrote a letter, introduced as Exhibit 40, to Banks McNairy, an officer of plaintiff, which contains the following sentence:

"As we have indicated on earlier occasions, and because practically everything that is being done at Holly Hill is on a cost plus basis, we hope that the closest possible supervision will be given the labor of the subcontractor."

Again, on 5 September 1969 defendant Latham wrote a letter, introduced as Exhibit 41, to one of the architects for the project,

with copies to Rouse and McNairy, which contains the following:

> "Also, we want this office to have a copy of each week's payroll, not only of T. A. Loving, but also of each subcontractor on the job. Once each week we will want to go over these lists with a representative of your office. *I had thought that our previous request for this information was clear, but apparently there has been some misunderstanding. I am well aware that this can be considered an intrusion by the owners into an area the sole responsibility of the architect and the General Contractor. However, this is not a fixed fee contract, and our interest in the day to day operations is far greater than would otherwise be the case.*" (Emphasis added.)

The attitude expressed in these letters, written long before the present litigation commenced, seems hardly consistent with defendants' present position that the parties had agreed that defendants' obligations under Exhibit B were to become effective only upon compliance with the alleged conditions precedent.

We find no error in the trial court's granting plaintiff's motion for directed verdict on defendants' Fourth Defense.

### Fifth Defense Appeal

[2]  For their Fifth Defense defendants attempt a twofold attack upon Exhibit B. First, they allege that "there was no consideration to the defendants for the delivery by them to the plaintiff of Exhibit B." In this connection, however, the trial court found on plenary evidence that Exhibit B was executed by the defendants "simultaneously with the reexecuted Construction Contract, . . . and both documents were delivered to the plaintiff by the original defendant, James F. Latham, on behalf of said original defendants through the mail contemporaneously, all as one act and as part of a single transaction." From this the trial court concluded that Exhibit B "was an integral part of the entire contract between the parties and with the reexecuted Construction Contract, . . . constituted a single indivisible agreement." The record fully supports these findings and conclusion. It is readily apparent, therefore, that execution by plaintiff on 19 August 1968 of the reexecuted construction contract, Exhibit A, which the parties dated back to 16 May 1968, supplied ample consideration to defendants to make

the obligations they assumed in Exhibit B contractually binding upon them.

[3] We find without merit defendants' suggestion that Exhibit B was inadmissible, and therefore must be considered legally inoperative, under the so-called parol evidence rule. As has been many times pointed out, the misnamed parol evidence rule "is in reality not one of evidence but of substantive law." 2 Stansbury's N. C. Evidence, Brandis Revision, § 251. As suggested in that treatise, "[t]ranslated into the language of the substantive law, the parol evidence rule may be expressed thus: *Any or all parts of a transaction prior to or contemporaneous with a writing intended to record them finally are superseded and made legally ineffective by the writing.*" Thus viewed, the question is presented here, as in all contract cases in which the rule is invoked, as to whether the parties assented to a particular writing as the complete and accurate "integration" of their contract. See 3 Corbin on Contracts, § 573. In this connection defendants contend that by Article 1 of the reexecuted contract, Exhibit A, the parties incorporated by reference another document, AIA Document A201, "General Conditions of the Contract for Construction," and that this document contains an express merger clause, the effect of which, so defendants argue, is to exclude Exhibit B from consideration as one of the contract documents. Both the reexecuted construction contract, Exhibit A, and the "General Conditions of the Contract for Construction" are on printed forms issued by the American Institute of Architects. While these documents are widely used in the construction industry, both for convenience and because they provide for many of the problems which practical experience has shown may be expected to arise in the course of a construction project, there is nevertheless no magic in the printed word. The problem remains, here as in other contract cases, of ascertaining the true intent and understanding of the parties.

Thus viewed, there can be no question in the present case but that the parties fully intended Exhibit B to be an essential and integral part of their contract. Defendants' own evidence is all to the effect that had defendants not executed Exhibit B, plaintiff would not have executed Exhibit A. Under these circumstances, to permit the standardized language in the printed forms, discovered long after the event by the keen eye of diligent defense counsel, to nullify the clearly understood and expressed intent of the contracting parties, would lead to a

patently unjust and absurd result which neither reason nor authority requires. Indeed, there is substantial authority to the contrary. "When several written contracts are separately and simultaneously executed, the fact that in one of them it is expressly stated that there are no such other contracts does not prevent their being proved and enforced, even though they contain promises and representations that would otherwise be excluded." 3 Corbin on Contracts, § 578, p. 407.

[4] The second attack made by defendants in their Fifth Defense upon the validity of Exhibit B is that it "is invalid and void for being in contravention of public policy." Certainly nothing in the document itself suggests any illegality. The recitations in the document are factually correct and the obligations to which defendants bound themselves are such as could be lawfully undertaken by honorable business men. Defendants do not contend otherwise. Their contention is that the failure of plaintiff to disclose the existence of Exhibit B to Wachovia and to Aetna renders it unenforceable as against defendants. We do not agree. As far as Wachovia is concerned, all of the evidence indicates that defendants, and not the plaintiff, maintained the most direct contacts and relationship. If there was a duty upon plaintiff to disclose Exhibit B to Wachovia, the same duty fell doubly upon defendants. Wachovia's rights are not being litigated in this action and its legal position can be in no way affected by any decision rendered herein. However, so far as the record in the present case reveals, the net result of the transactions disclosed was to place upon the lands on which, under its loan commitment, Wachovia was entitled to hold a first mortgage lien, a shopping center both substantially larger and considerably more expensive than was originally contemplated. It is difficult to see how such a result could have affected Wachovia's position adversely.

On motion of the defendants, Aetna was made an additional party defendant in this case, and Aetna has filed answer asserting its right to revoke its performance bond on the ground that the terms of the construction contract actually existing between plaintiff and defendants were substantially different from the terms of the contract which it was led to believe it was bonding. However that may be, and we emphasize that Aetna's rights are not being determined on this appeal, we point out that in any event the condition of the bond signed by Aetna as surety was such that it became void if plaintiff, as principal, well and

truly performed all of its undertakings under the construction contract. So far as everything in the present record suggests, plaintiff has long since completely performed under that contract.

Whatever effect failure to disclose Exhibit B may have had upon the rights of Wachovia and Aetna, under the present circumstances we perceive no sound reason why good public policy requires that that failure, in which defendants fully participated, should result in defendants being now relieved of their obligations to plaintiff under Exhibit B. We find no error in the trial court's order ruling in plaintiff's favor on defendants' Fifth Defense.

Both orders appealed from are

Affirmed.

Judges CAMPBELL and VAUGHN concur.